# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01064-NYW

ANDREW PETERSON,
on behalf of himself and all similarly situated persons,

      Plaintiff,

v.

NELNET DIVERSIFIED SOLUTIONS, LLC,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This civil action comes before the court on Plaintiff Andrew Peterson's ("Plaintiff" or "Mr. Peterson") and Defendant Nelnet Diversified Solutions, LLC's ("Defendant" or "Nelnet") cross-motions for summary judgment ("Plaintiff's MSJ" and "Defendant's MSJ", respectively) [#158; #168] as well as Nelnet's Motion to Decertify FLSA Collective Action ("the Decertification Motion") [#171]. The undersigned fully presides over this case pursuant to 28 U.S.C. § 636(c), the consent of the Parties [#11], and the Order of Reference dated June 26, 2017 [#12]. For the reasons stated in this Memorandum Opinion and Order, Defendant's Motion for Summary Judgment is **GRANTED**, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Decertification Motion is **DENIED AS MOOT**. Because there are no federal claims remaining, the court declines to exercise supplemental jurisdiction and **REMANDS** the case to state court.

# BACKGROUND

Plaintiff Andrew Peterson ("Plaintiff" or "Mr. Peterson") initiated this action on April 28, 2017, by filing a Complaint asserting a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), for unpaid overtime wages "on behalf of himself and all current and former Account Managers and Call Center Representatives."[1]  [#1].  Mr. Peterson worked for Defendant Nelnet, which is in the business of servicing loans, at its Aurora, Colorado location from approximately September 2011 to September 2014.  [*Id.* at ¶¶ 10, 11].  Mr. Peterson alleged that Nelnet violated the FLSA by failing to pay him and other call center representatives premium overtime compensation for hours worked in excess of forty hours in a workweek.  [*Id.* at ¶ 2].  In support of his claim, Mr. Peterson averred that Nelnet failed to accurately track or record the actual hours worked by CCRs as follows: "(i) [by] failing to provide [call center representatives] with a way to accurately record the hours they actually worked; (ii) permitting [call center representatives] to work before and after they 'clock in' to Nelnet's timekeeping system; and (iii) allowing work during uncompensated lunch breaks."  [*Id.* at ¶ 6].  In his original Complaint, Mr. Peterson asserted claims for: (1) violation of the FLSA on behalf of himself and the collective; (2) violation of Colorado Minimum Wage Order on behalf of himself and a Rule 23 class of individuals ("Second Cause of Action"); and (3) violation of the Colorado Wage Act on behalf of himself and a Rule 23 class of individuals ("Third Cause of Action").  [#1].  Defendant subsequently filed a Motion to Dismiss, [#19], which was mooted when Plaintiff filed his Amended Complaint as a matter of right.  [#29; #30].  The Amended

---

[1] When referring to "Plaintiff" the court intends to refer both to Mr. Andrew Peterson and the collective joined in this litigation.  The court will use "Mr. Peterson" when referring to Mr. Peterson's individual state law claims and the arguments made in support of that claim.

Complaint included the same three claims with additional factual detail. [#29]. Defendant filed an Answer to the Amended Complaint on October 5, 2017. [#37].

On January 31, 2018, Plaintiff filed a Motion for Court Authorized Notice Pursuant to 29 U.S.C. § 216(b) of the FLSA ("Motion for Conditional Certification"). [#50]. On April 25, 2018, the court granted the Motion for Conditional Certification in part, allowing a collective to go forward as to Advisors, Collectors, and Flex Advisors for pre-shift uncompensated log-in time (collectively, "CCRs"). [#79]. Shortly thereafter, the parties stipulated to the following definition of the conditionally certified collective:

> Current and former Flex Advisors, Collectors, or Advisor Is who worked at Nelnet Diversified Solutions, LLC's Aurora, Colorado; Lincoln, Nebraska; and Omaha, Nebraska Customer Interaction Center locations at any time from July 15, 2014 to April 25, 2018 and who worked off-the-clock without compensation at the beginning of their shifts prior to clocking into the timekeeping system. Individuals who worked as Collectors in Direct Account Placement or "DAP" are not included in this collective definition.

[#82].

On June 29, 2018, the notice administrator mailed the FLSA collection action notice to the putative collective members who worked at the relevant locations in Aurora, Lincoln, and Omaha. [#92]. Ultimately, 359 individuals opted into the FLSA collective, a few of whom have since been dismissed from the collective for unrelated reasons, primarily failure to participate in discovery. [#99; #100; #101; #102; #105; #108 at 11 n.3].

On November 16, 2018, the Parties submitted a Joint Status Report, in which Plaintiff indicated "[t]he Plaintiff is no longer pursuing any Rule 23 class action claims." [#117 at 1]. Plaintiff further indicated "[i]f the case reaches a trial, such trial would therefore be narrowed to the compensability of activities that plaintiff alleges he was required to perform to become call-ready before clocking in pre-shift and related potential damages issues." [*Id.* at 2]. The Parties

then indicated that they believed trial could be completed in five days. [*Id.*]. Based on this Status Report, the court dismissed the Second and Third Causes of Action from the Amended Complaint and ordered the Parties to file a Supplemental Scheduling Order. [#119]. Following a Motion to Reconsider based on an ambiguity as to whether the Aurora-based FLSA collective members were still asserting their Colorado state law claims individually if not as a class, the court affirmed its prior order and denied further relief, finding that the relevant claims remaining were the conditional class's FLSA claims and Mr. Peterson's individual state law claims. [#128; #153]. Shortly thereafter, the Parties filed the instant cross-motions for summary judgment and Defendant filed the Decertification Motion. After an extension of time harmonized the briefing schedule on the pending motions, briefing closed on June 21, 2019, and the matters are now ripe for decision.

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Nevertheless, the content of the evidence presented at summary judgment must be admissible to be considered. *See* Fed. R. Civ. P. 56(c)(4); *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so

one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

The court begins by considering the cross-motions for summary judgment.  The court begins with the undisputed material facts and then examines whether the time at issue qualifies as compensable time.  Finding the time compensable, the court then proceeds to consider whether the time is *de minimis* and concludes that the time at issue is so brief and recording it poses such an administrative challenge that the time is *de minimis* as a matter of law.  Accordingly, the court concludes that summary judgment should enter for Defendant.

# UNDISPUTED MATERIAL FACTS

The following undisputed material facts are drawn from the Parties' cross-motions for summary judgment.[2]

1. Defendant Nelnet Diversified Solutions LLC is in the business of servicing student loans. [#168-1 at 5, 39:16–20].

2. To this end, Nelnet maintains several "customer interaction centers" in Aurora, Colorado; Lincoln, Nebraska, and Omaha, Nebraska. [*Id.* at 41:17–22].

3. At these centers, Nelnet employees service student loans and interact with debtors over the phone and through email. [*Id.* at 2, 9:4–15]. This case is concerned with those employees who were worked as Flex Advisors, Collectors, or Advisors I from July 15, 2014 to April 25, 2018 ("the CCRs" or "the employees").

4. CCRs are paid once they clock into the timekeeping system at their individual workstations.[3] [#168-8 at 2, 12:12–24]. Before a CCR may clock in to the system, he or she must first perform several steps.

5. First, the CCR selects a workstation and moves the mouse or presses a key to wake the computer up from standby mode. [#168-11 at 3].

---

[2] The Parties agree as to all the relevant material facts, but occasionally disagree with another party's precise framing of a material fact or present a putative material fact which is actually an inference or conclusion drawn from other material facts without direct evidentiary support. The Parties also proffer many material facts which the court does not find relevant to its disposition of the matter. The court accepts and recounts below only the relevant material facts, disregarding another party's objection as to the correct interpretation of that fact and disregarding those alleged facts which are not relevant or directly supported by evidence. For ease of reference, the court will cite to the relevant underlying exhibit initially, but future reference to this section will cite to these facts in the following format: "Material Fact ¶ 1."

[3] Nelnet has used several different timekeeping systems in the relevant timeframe but because the exact system is not relevant, the court does not distinguish between these systems.

6.   The CCR then inserts an "Imprivata" security badge and enters his or her credentials (username, password).  [*Id.*].

7.   The computer automatically launches Citrix, which loads the CCR's personal desktop, and Nelnet's Intranet which contains a link to the timekeeping system.  [*Id.*].

8.   Once the Intranet has loaded, an employee has access to the timekeeping system and may, and nearly always does, clock into the system and begin receiving payment.  [*Id.*; #168-5 at 2–3, 7:4–10:24].   The time from the Imprivata badge swipe to the Citrix session initiating is referred to as the "Boot-Up Time" and the time from Citrix initiating to the timeclock check in is referred to as the "Citrix-Active Time" and collectively, "pre-shift activities."

9.   Completing these pre-shift activities is necessary to conduct the CCRs' principal job duties.  [*Id.*; #159-1 at 39, 17:8–13].

10.  The median Boot-Up Time is 0.5 minutes in Omaha, 0.9 minutes in Lincoln, and 1.02 minutes in Aurora.  [#168-16 at 17].

11.  The median 10th percentile Citrix-Active Time—which the parties accept as the relevant measure—is 1.1 minutes at Omaha, 1.3 minutes in Lincoln, and 1.25 minutes in Aurora.  [*Id.*].

12.  Nelnet policy provided that CCRs were to be "call ready" within six minutes of their scheduled shift, and, by custom, permitted CCRs to clock in five minutes prior to the start of a shift.  [#168-31 at 2; #168-32 at 1].

13.  Nelnet policy is that an employee should clock in at this point before launching any further programs.  [*Id.* at 12–13, 161:9–162:8].

14. To become call ready after booting up the computer and launching Citrix and the Intranet, a CCR must launch several additional programs. [*Id.* at 162:9–23].

15. Nelnet permits its employees to use their computers for personal tasks and the timekeeping system design permits the employee to clearly delineate when the work begins and ends. [#168-23 at ¶ 13].

16. CCRs are also permitted to do personal tasks when waiting for the pre-shift activities to complete which are basic, rote activities that do not require much if any thought or effort. [#168-18 at 2–3, 57:7–18, 138:3–140:2].

17. Nelnet does not, and has never, used the timestamps associated with logging into Citrix or insertion of the Imprivata Badge for timekeeping purposes. [168-9 at ¶ 10].[4]

18. It would be technically challenging to link the Imprivata or Citrix timestamps to the timekeeping system typically used for compensation. [#168-23 at ¶¶ 10–15; #168-9 at ¶¶ 11–16].

---

[4] Plaintiff challenges Material Facts ¶¶ 17–19 on the basis that "Defendant admitted to never consulting Citrix, Imprivata, or anyone internally about linking its records with Plaintiffs' time stamps and therefore any claim that such a practice is impossible or impracticable is baseless." [#174 at 6]. Citing the deposition of Jason Latimer, Plaintiff notes that he stated that "to [his] knowledge" Nelnet never examined the feasibility of linking Imprivata or Citrix to the timekeeping system. [#174-2 at 4–5, 6–7]. This statement is insufficient to rebut the uncontroverted testimony of Wendi Beck, Managing Director of Benefits, Compensation, and Payroll for Nelnet, who definitively states that linkage would be "not possible" given the design of the systems at issue [#168-23 at ¶¶ 10–16] and Greg Counts, IT Director for Nelnet, who similarly states that Nelnet has "no technological means" to link the systems at issue and that Nelnet would "most likely" have to build specialized software to accomplish such a task. [#168-9 at ¶¶ 10–16]. To be a "genuine" factual dispute, there must be more than a mere scintilla of evidence and the dispute must be more than "merely colorable." *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). Plaintiff's reliance on Mr. Latimer's lack of knowledge whether such linkage was considered does not create a genuine material dispute that linking the two systems at issue would be possible as Plaintiff offers no evidence such as an expert opinion or admission that the linkage is possible but Nelnet merely failed to ask.

19. Linking the CCR's compensation to the Imprivata Badge insertion or Citrix login would most likely require custom-made software which Nelnet neither possesses nor knows how to create. [#168-23 at ¶ 12; #168-9 at ¶ 12].

## ANALYSIS

### I. Are the Pre-Shift Activities Covered by the FLSA?

The Parties refer to the two categories of pre-shift time, the Boot-Up Time (defined as the time between the employee's badge swipe and the time stamp initiating the process of booting up each Citrix sessions) and the Citrix-Active Time (defined as the time between completing the launch of the Citrix virtual desktop application and completion of clocking in), as distinct. *E.g.*, [#158 at 13–14; #168 at 24]. As discussed more fully below, the court's analysis renders any distinction between the two categories immaterial, and so the court simply refers to these two categories as the "pre-shift activities."

### A. Legal Standard—Compensable Time

The FLSA does not provide a definition of work, and United States Supreme Court has long-described "work or employment" under the FLSA as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S.680, 691-92 (1946). A year after *Anderson* and in response to concerns over overbreadth, Congress passed the Portal to Portal Act of 1947, codified at 29 U.S.C. §§ 251–262, amending certain provisions of the FLSA to specifically preclude coverage for activities that are considered "preliminary or postliminary" to the principal activity of work. *IBP*, 546 U.S. at 25. The "principal activities" are those activities for which an employee is employed. *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513. 518

(2014) (quoting 29 U.S.C. § 254(a)(1)).  Under the "continuous-workday rule," all activity from the first principal activity is ordinarily compensable until the last principal activity.  *Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1243 (10th Cir. 2016).

Relevant here, § 254(a)(2) provides that "no employer shall be subject to any liability" for "activities which are preliminary to or postliminary to said principal activity or activities" which occur before or subsequent to "principal activities or activitie s" in the workday.  This distinction is not always easily made.  The Supreme Court has recognized that some activities which are temporally preliminary to the principal gainful activity the employee is employed to perform are compensable as those same principal activities when such preliminary activities are "an integral and indispensable part of the principal activities for which workmen are employed." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956).  The word "integral" has been interpreted to mean "a duty that cannot be dispensed with, remitted, set aside, disregarded, or neglected." *Integrity Staffing*, 135 S. Ct. at 517.  On the other hand, under this integral and indispensable standard, activities which are necessary to perform one's work but not substantively connected to the actual performance of such work are not considered compensable.  For instance, walking to a workstation or waiting to don protective gear may be a necessary precondition to performing one's duties but it is nonetheless not compensable because it is unrelated to the performance of those duties.  § 254(a)(1) (excepting "riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform"); *IBP*, 546 U.S. at 42.  Similarly, although not required to perform an employee's principal activities, an employer may require certain tasks of employees without rendering time spent performing such tasks compensable, such as mandatory security screenings. *Integrity Staffing*, 135 S. Ct. at 518.  Likewise, passing through a security checkpoint for a nuclear plant is

essential to the security of such a sensitive facility, but it is unrelated to the performance of the plant workers' duties. *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 593–94 (2d Cir. 2007).

But when a preliminary task is integral and indispensable to the performance of the employee's principal activities, that preliminary task is compensable. *Steiner*, 350 U.S. at 256. For example, some chemical plants work with hazardous chemicals on a regular basis such that extensive protective gear and regular bathing is required to maintain a healthy and safe working environment. *Id.* at 249. The act of donning the protective gear and bathing to remove harmful chemical particulate matter is considered integral and indispensable because it is inextricably interrelated to the performance of an employee's work in such environment. *Id.* at 256. Similarly, time spent sharpening knives for work at a slaughterhouse is considered integral and indispensable because "razor sharp" knives are required to safely and effectively produce clean and aesthetically pleasing cuts of meat. *Mitchell v. King Packing Co.*, 350 U.S. 260, 263 (1956). In sum, "an activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 135 S.Ct. at 519.

## B. Application

Nelnet argues that the pre-shift activities at issue are not compensable because they are not principal activities but rather preliminary activities which are neither integral or indispensable to work. [#168 at 18-22; #174 at 6-13]. Relying on *Reich v. IBP, Inc.*, 38 F.3d 1123, 1124 (10th Cir. 1994) and *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274 (10th Cir. 2006), Nelnet also argues that the pre-shift activities cannot be integral to Plaintiff's principal activities, because the pre-shift activities are not demanding and permit a CCR to engage in

personal discussions and diversions during the process. [#168 at 19; Material Fact ¶ 16]. Nelnet also contends that computers are not integral and indispensable but instead merely enhance the performance capacity of the CCRs. [#168 at 20 ("That Opt-Ins can complete their work assisting borrowers more efficiently using electronic records (rather than voluminous paper files) is insufficient to render logging in to computers and loading job-relevant programs "integral and indispensable.")].

Plaintiff argues that the pre-shift activity time is compensable because the work performed during that time is the first "principal activity," relying on Department of Labor Fact Sheet #64. [#179 at 4-6]. Plaintiff further contends that even if the logging in process is not considered a "principal activity," it is still compensable because the pre-shift activities are integral and indispensable, as a CCR cannot use the Citrix system until it has been successfully initiated, and the Citrix system is required by Nelnet in order for the CCRs to make and receive calls for loan servicing. [#158 at 15; 179 at 6–7].

### 1. Are Pre-Shift Activities "Principal Work" or "Preliminary Work"?

*Fact Sheet #64.* Plaintiff contends that the Department of Labor's Wage and Hour Division's Fact Sheet #64 ("Fact Sheet"), attached to Plaintiff's Motion for Summary Judgment as Exhibit E. [#159-1 at 88], establishes that the pre-shift activities are "principal work," and is entitled to significant deference under *Skidmore v. Swift & Co*., 323 U.S. 134 (1944). [#158 at 10, #174 at 5-6]. The Fact Sheet is specific to call center workers and states that "An example of the first principal activity of the day for agents/specialists/representatives working in call centers includes starting the computer to download work instructions, computer applications, and work-related emails." [#159-1 at 90]. Defendant counters that the Fact Sheet merits no deference, much less *Skidmore* deference. [#180 at 5–7].

Under *Skidmore*, the deference due to an administrative agency interpretation of the law depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Gonzales v. Oregon*, 546 U.S. 243, 268 (2006); *Flores-Molina v. Sessions*, 850 F.3d 1150, 1158 (10th Cir. 2017) (same). Here, by its own terms, the Fact Sheet #64 only "provides general information and is not to be considered in the same light as official statements of position contained in the regulations." [#159-1 at 90]. In addition, in concluding that "starting the computer to download work instructions, computer applications, and work-related emails," the Department of Labor did not engage in substantive analysis nor cite to statutory reference or case law interpretation. [*Id.*]. *Cf. Salazar v. Butterball, LLC*, No. 08-CV-02071-MSK-CBS, 2010 WL 965353, at *5 (D. Colo. Mar. 15, 2010), *aff'd*, 644 F.3d 1130 (10th Cir. 2011) (observing that DOL "Opinion Letters and the like are entitled to respect or deference to the extent that they have the 'power to persuade', which is based on the thoroughness of the evaluation, the validity of the reasoning, the opinion's consistency with earlier and later pronouncements, and any other factors which a court finds relevant" and finding that the DOL's 1997 and 2001 opinion letters regarding donning and doffing were entitled to some deference after finding the agency's position and reasoning persuasive). Plaintiff cites no authority, and this court could not independently find any, that accords Fact Sheet #64 any deference, and the court notes that the Fact Sheet was last revised in July 2008 [#1591 at 89], prior to further refinement of the applicable law by the Supreme Court and Tenth Circuit. Accordingly, this court affords limited deference to Fact Sheet #64, and notes that it does not displace or supersede the court's own interpretation and judgment with respect to whether pre-

shift activities here are "principal work" or otherwise compensable. *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1085 (D. Colo. 2016).

*Bustillos*. For its part, Nelnet argues that this court should simply follow *Bustillos v. Bd. of Cty. Commissioners of Hidalgo Cty.*, No. CV 13-0971 JB/GBW, 2015 WL 7873813 (D.N.M. Oct. 20, 2015), *aff'd in relevant part, rev'd in part sub nom. Jimenez v. Bd. of Cty. Commissioners of Hidalgo Cty.*, 697 F. App'x 597 (10th Cir. 2017) and find that, as a matter of law, the preshift activities are not principal work and constitute noncompensable tasks. *Bustillos* involved a 911 call center operator who had to perform several preliminary tasks before beginning work, including logging into her computer. 2015 WL 7873813 at *17. There, the district court found that "[d]onning a headset, logging into the computer, and cleaning her workstation are merely preliminary or postliminary to the productive work that the employee is employed to perform. These activities do not constitute the actual work of consequence performed for an employer, and are more like the ingress and egress process." *Id.* (quotations and citations omitted). On appeal, the Tenth Circuit affirmed in an unpublished opinion "for substantially the reasons advanced by the district court for each of its rulings." *Jimenez*, 697 F. App'x at 598. In a footnote without any analysis, the Tenth Circuit distinguished, without discussion, the pre-shift briefing from "other preliminary, non-compensable tasks such as putting on her headset and logging into her computer." *Id.* at 599 n.2.

The court respectfully declines to find *Bustillos* controlling in this instance simply because the activities at issue are similar and further declines to suggest that logging into a computer system should be treated in all cases as "the digital equivalent of travel or of waiting in line to clock in." [#168 at 18]. The controlling authority makes clear that courts must determine on a case-by-case basis whether an employee's activities are compensable under the FLSA. *See*

*Smith v. Aztec Well Servicing Co*., 462 F.3d 1274, 1285 (10th Cir. 2006) (citations omitted); 29 C.F.R. § 785.6.

*Bustillos* relied on *Integrity Staffing*, but this court finds the ingress/egress argument unavailing because the screening at issue in *Integrity Staffing* was wholly unrelated to the performance of the employees' tasks—the employees had completed their tasks and were screened as they left the warehouse. 135 S. Ct. at 515. By contrast, setting up one's computer to take calls at a call center is intertwined with the substance performance of the day's tasks. A different situation might arise if employees were not paid for postliminary tasks such as shutting down one's workstation and logging out, but here the pre-shift activities are both necessary to the performance of the day's tasks and a material part of such performance.

The *Bustillos* court then went on to analogize to *Aztec Well* and out-of-circuit donning and doffing cases to emphasize that "pre- and post-shift activities that can be accomplished with minimal effort and time are non-compensable." 2015 WL 7873813 at *18. But this court concludes that this case is more like *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1350 (10th Cir. 1986) (transporting tools to worksite considered integral and indispensable),and *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) (transporting equipment to and from well sites was compensable) because the pre-shift tasks refer to the substantive tools of performance, not secondary gear like safety goggles or hardhats. *Compare Mitchell*, 262 F.2d at 555 ('But employees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities."), *with Aztec Well*, 462 F.3d at 1289 ("Nor is there any evidence that Aztec regularly required the plaintiffs to pick up or drop off essential

equipment or paperwork while traveling, which could also constitute a "principal activity" within the meaning of the Portal–to–Portal Act. . . .  Requiring employees to show up at their work stations with such standard equipment as a hard hat, safety glasses, earplugs, and safety shoes is no different from having a baseball player show up in uniform, or a judge with a robe. It is simply a prerequisite for the job, and is purely preliminary in nature." (citations and quotations omitted, formatting altered)).

The court finds the *Aztec Well* court's discussion of § 790.7(d) to be illuminating on this point.  § 790.7(d) provides that while commuting and travel time is not normally compensable, when "walking, riding, or traveling is not segregable from the simultaneous performance of his assigned work (the carrying of the equipment, etc.) . . . it does not constitute travel 'to and from the actual place of performance' of the principal activities he is employed to perform [as exempted under the Portal Act, 29 U.S.C. § 254(a)(1)]."  § 790.7(d).  While the *Aztec Well* court found that showing up with basic safety gear was "not segregable from the simultaneous performance of [the employees'] assigned work," the court finds that the pre-shift activities in this case are distinguishable and so neither *Aztec Well* nor *Bustillos* are availing.  A logger who neglects to carry "a portable power saw or other heavy equipment (as distinguished from ordinary hand tools) on his trip into the woods to the cutting area" simply cannot perform his tasks under any circumstances.  *Id.*  A logger is expected to show up to the work site with a hard hat, but the employer provides the chainsaw which the employee must prepare to perform the work expected of him.  Similarly, the CCRs would be unable to perform the labor for which they were hired if they did not complete the pre-shift activities to prepare the equipment their employer provides for them to use in performing their tasks.  In short, the court finds that *Aztec Well* and § 790.7(d) support the court's finding that the pre-shift activities are integral to the

principal activities, and respectfully disagrees with the *Bustillo* court's determination to the contrary to the extent that court's analysis is in tension with the court's analysis here.

**The Pre-Shift Activities are Not, by their Nature, Principal Activities.** There is no dispute that "the principal activity of work" of the CCRs is the servicing of loans. Material Fact ¶ 1. The CCRs service student loans and interact with debtors over the phone and through email. *Id.* at ¶ 3. And aside from the language from Fact Sheet #64 characterizing "starting the computer to download work instructions, computer applications, and work-related emails," as "principal work," there is no real dispute that the CCRs are not hired to log into a computer system. *See Integrity Staffing*, 135 S.Ct. at 518 (observing that "principal activity of work" are those activities for which an employee is employed). Therefore, this court concludes that the pre-shift activities do not constitute the employees' "principal work."

This conclusion, however, does not resolve whether the time associated with the pre-shift activities are compensable. This court finds that the appropriate approach is to consider, based on the circumstances presented here, whether the pre-shift activities are compensable under *Steiner*. 350 U.S. at 256. Indeed, to hold otherwise might suggest that login activities, regardless of the principal work at issue, were categorically compensable or noncompensable. The case law interpreting the FLSA does not suggest to this court that painting with such a broad brush is appropriate, *compare Steiner*, 350 U.S. at 256 (holding that clothes-changing and showering were an integral and indispensable part of the principal activity of manufacturing automotive-type wet batteries) *with Gorman*, 488 F.3d at 594 (holding that donning a helmet, safety glasses, and steel-toed boots, though indispensable, were not integral to working at a nuclear power plant). Accordingly, the court now turns to whether the pre-shift activities are

compensable as preliminary work that is integral and indispensable to the principal activities of the employees under the FLSA.

### 2. Are the Pre-Shift Activities Integral and Indispensable?

*Time and complexity.* First, this court finds that Nelnet's arguments that the pre-shift activities are not compensable because they take a short period of time to complete and that CCRs can perform other tasks during the same time are more appropriately considered within the inquiry of whether the *de minimis* exception applies. The length of time and the complexity of the task alone are not necessarily material to the analysis of such activities are "an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 135 S. Ct. at 519. *Cf. Reich*, 38 F.3d at 1126 n.1 ("It could also be said that the time spent putting on and taking off these items is de minimis as a matter of law, although it is more properly considered not work at all. Requiring employees to show up at their workstations with such standard equipment is no different from having a baseball player show up in uniform, a businessperson with a suit and tie, or a judge with a robe. It is simply a prerequisite for the job, and is purely preliminary in nature.").

*Integral and Indispensable Preparatory Work.* Court have long held that pre-shift preparation of tools or equipment is considered integral and indispensable to the principal activities when the use of such tools in a readied or activated state is an integral part of the performance of the employee's principal activities. *See, e.g.*, *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009) (checking out specialized tools is compensable). Thus, sharpening knives for work in a slaughterhouse qualifies because the employees regularly use the knives in performing their duties. *King Packing*, 350 U.S. at 263. And setting up and testing an MRI machine qualifies as well because the machine must be

in its ready-to-use state for patients coming in at the start of the day. *See Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 717–18 (2d Cir. 2001). So too is loading a truck with tools to drive to a worksite, *Gaytan v. G&G Landscaping Constr., Inc.*, 145 F. Supp. 3d 320, 325 (D.N.J. 2015), and grooming, feeding, and training police dogs for canine officers whose job depends on an efficient canine partner, *Reich v. New York City Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995); *Andrews v. DuBois*, 888 F. Supp. 213, 216 (D. Mass. 1995).

Here, the court finds that setting up the computer and loading the relevant programs to become call-ready is "an integral and indispensable part of the principal activities for which workmen are employed" under *Steiner v. Mitchell*, 350 U.S. 247 (1956), and therefore does not fall within the Portal Act's exemption. There appears no dispute between the Parties that "Opt-Ins necessarily use computers to access electronically stored information, which requires Opt-Ins to log in to their computers and open job-relevant software." [#168 at 20; Material Fact ¶ 9]. Indeed, the very data that allows the CCRs to service student loans, e.g., borrower information and payment history, appears to reside within the computer system; there is no evidence before this court that Plaintiffs have access to such information outside the computer applications. Nelnet recognizes that "many modern hourly workers use computers to access electronically stored information to perform their work" [#168 at 20] and in this case, part of the expected principal activity of CCRs is to interact with borrowers through email. [Material Fact ¶ 3].

***Ingress Process.*** Nelnet argues that the pre-shift activities are the equivalents of historically non-compensable ingress to the workstation and waiting in line to clock in. The court respectfully disagrees. Nelnet analogizes extensively to the ingress process which is specifically classified as non-compensable preliminary time under the Portal Act, 29 U.S.C.A. § 254(a)(1). *See, e.g.*, [168 at 13 (referring to it as "digital ingress or wait time")]. But this

analogy fails because, specific statutory exemption for travel time aside, the ingress process is not a part of the performance of the day's labor, it is rather simply a necessary precondition like the antecedent commute from the worker's home to the place of employment. Here, the pre-shift activities are not only necessary, but the CCR makes regular use of the prepared electronic tools in performing their substantive tasks. Therefore, the necessary preliminary work is intertwined with the substantive performance of the principal tasks which renders such preliminary work integral and indispensable. An employee is not employed to arrive at the office or pass through a security checkpoint, but she is employed to use certain tools in performance of her tasks, and pre-shift preparation of those tools is integral and indispensable to the performance of the principal labor for which the employee is employed.

Indeed, although the parties separate the day between the pre-shift activities and the remainder of the day, the court finds that there is no basis to distinguish the Boot-Up Time and the Citrix-Active Time from subsequent time where the CCR is required to launch several additional programs to become call-ready but has clocked in and begun receiving compensation. [Material Fact ¶ 14]. Nelnet specifically argues that these acts are not distinct. [#168 at 12 n.5 ("[N]either the time spent logging-in to the computer nor loading job-related programs is compensable.")]. But under the "continuous-workday rule," once the employee's work day starts with the first principal activity, all activity is ordinarily compensable until the work day ends, *Castaneda v. JBS USA, LLC*, 819 F.3d 1237, 1243 (10th Cir. 2016). The entire time the CCR spends from first inserting the Imprivata badge to becoming call ready—"the call-ready process"—is more sensibly viewed as one continuous process required to prepare CCRs to perform the principal activity for which they were hired, i.e., servicing student loans by interacting with borrowers via email or telephone. This is work that is done for the benefit of the

employer and is intertwined with the substantive performance of the day's labor where the CCR regularly makes use of the materials and programs prepared in this process to do assigned work. *Crenshaw v. Quarles Drilling Corp.*, 798 F.2d 1345, 1350 (10th Cir. 1986) (transporting tools to worksite considered integral and indispensable), *overruled on other grounds, McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); *D A & S Oil Well Servicing, Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir. 1958) (transporting equipment to and from well sites was compensable under the Portal Act because "transport[ing] equipment without which well servicing could not be done, [is] an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities").

Donning and doffing cases help illustrate the distinction between necessary work and necessary work intertwined with the substantive performance of the employee's tasks. When the gear required of an employee is both required and must be donned and doffed at the employer's facility, that time is compensable. When the gear is not required or may be donned and doffed at home, then that time is not compensable. Donning and doffing a police uniform is not integral because one can do that at home, *Bamonte v. City of Mesa*, 598 F.3d 1217, 1227 (9th Cir. 2010) ("[T]he relevant inquiry is not whether the uniform itself or the safety gear itself is indispensable to the job—they most certainly are—but rather, the relevant inquiry is whether the nature of the work requires the donning and doffing process to be done on the employer's premises." (citing

lower court opinion, quotations omitted)).[5]  But cleanroom workers who were required to don and doff at the facility were exempted from the Portal Act because that act was considered integral and indispensable, *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 911 (9th Cir. 2004), and as already mentioned, the same applies to slaughterhouse workers wearing special gear, *IBP*, 546 U.S. at 32, and battery plant workers handling hazardous chemicals, *Steiner*, 350 U.S. at 27. And just as two employees can make small talk while putting on chainmail gloves, the CCRs here can talk while booting up their computers without changing the nature of the activity.

*Wait Time.*  Nelnet's analogy to wait time is more compelling but ultimately unpersuasive.  Generally, an employee waiting to begin a principal activity is engaged in preliminary, non-compensable time.  29 C.F.R. § 790.7(g) ("Other types of activities which may be performed outside the workday and, when performed under the conditions normally present, would be considered "preliminary" or "postliminary" activities, include checking in and out and waiting in line to do so . . . ."); *see also, e.g.*, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 42 (2005) (waiting to begin the process of donning protective gear is "two steps removed from the productive activity" and not compensable); *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 226 (5th Cir. 2017) (holding that time spend waiting for company bus and driving to worksite were not compensable). Here, the pre-shift activities are only one step removed from the principal activity and, again, necessarily intertwined with the performance of such tasks.  That the pre-shift activities involve periods of waiting alternating with rote input no more precludes a

---

[5] The Tenth Circuit has addressed donning and doffing protective gear in a slightly different manner.  Instead of considering the relation between the protective gear and the work performed, the Tenth Circuit has focused on the definition of "changing clothes" which is exempted from the definition of "hours worked" under 29 U.S.C. § 203(*o*).  *Salazar v. Butterball, LLC*, 644 F.3d 1130, 1136 (10th Cir. 2011).  The *Butterball* court did not address the integral and indispensable question.  *Id.* at 1138 n.4.

finding of indispensability than waiting at a stop light would in *Crenshaw* or *Mitchell*. And the availability of personal entertainment during this process no more precludes such finding than the *Crenshaw* or *Mitchell* plaintiffs listening to the radio or talking with one another would.

The court finds that Defendant's other authority is also distinguishable. For example, Nelnet cites to *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793 (D. Md. 2014) and *Kuebel v. Black & Decker (U.S.) Inc.*, No. 08-CV-6020, 2009 WL 1401694 (W.D.N.Y. May 18, 2009), to argue that logging into a computer and receiving work instructions was not compensable. [#168 at 17]. But the email correspondence and computer use in those cases is distinguishable because it only involved receiving instructions and directions—in neither case did the employees then make consistent use of the computer systems in performance of their tasks as, respectively, cable-company technicians and retail specialists. *Butler*, 55 F. Supp. 3d at 797; *Kuebel¸* 2009 WL 1401694, at *2. The computer use in this case is consistent and integral the performance of the CCR's duties, not merely an unrelated precondition such as receiving directions to the next job site. Having found that the pre-shift activities are integral and indispensable nature to the CCRs' principal tasks, this court now turns to whether they are nevertheless noncompensable because they are *de minimis*.

**II.      Are the Pre-Shift Activities Nevertheless Noncompensable as *De Minimis*?**

Nelnet argues that the pre-shift activity time in this case, which in the usual course takes no more than two and a half minutes on the high end, constitutes *de minimis* activity and is therefore not compensable under *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946).  [#168 at 23].  Plaintiff counters that this time occurred reliably with every shift, and even if the amount is small, the claim in the aggregate is not.  [#174 at 15].  The court finds this time is *de minimis*.

The Tenth Circuit, adopting the test applied in the Ninth Circuit formulated in *Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984), applies a multi-factor balancing test to determine whether the time at issue is "insubstantial or insignificant . . . [and] which cannot as a practical administrative matter be precisely recorded for payroll purposes."  29 C.F.R. § 785.47.  First, the amount of time spent on a daily basis must be sufficiently brief to qualify as *de minimis*—courts usually permit a period of up to ten minutes to qualify as *de minimis*, although the application of the exception depends on satisfaction of the other factors in the test.  *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333 (10th Cir. 1998).  Second, the court considers the practical administrative difficulty of recording the time.  *Id.* at 1334.  Third, the size of the claim in the aggregate.  *Id.* Fourth and finally, whether the claimants performed the work on a regular basis.  *Id.*  No single factor is determinative in this holistic analysis.  *Id.* at 1333 (stating that the court must "evaluate" these "factors"); *Garcia v. Tyson Foods, Inc.*, 766 F. Supp. 2d 1167, 1179 n.8 (D. Kan. 2011).  Because the time in this case clearly falls well below the ten-minute threshold, the court proceeds directly to the other factors.

***Regularity and Ascertainability.***      The court finds that the time in case regularly occurring, readily ascertainable, and therefore is not "uncertain and indefinite."  The parties do

not dispute that the pre-shift activities occurred every time a CCR logged onto a system before beginning work, nor do the parties dispute that the pre-shift activities have a definite start with waking up the computer and inserting the Imprivata badge. Nelnet disputes the ease with which it could use such information for timesheet purposes, but that is not the court's concern for this factor. For the *de minimis* analysis, the court is concerned with whether the occurrence and length of the unpaid time is certain and definite, and in this case it is. "An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." *Jimenez v. Bd. of Cty. Commissioners of Hidalgo Cty.*, 697 F. App'x 597, 599 (10th Cir. 2017) (quoting 29 C.F.R. § 785.47). The time is regularly occurring and may be readily ascertained and thus this factor weighs in favor of Plaintiff. The court now turns to Nelnet's argument that it is practically burdensome for such time to be reliable recorded given the use of the timekeeping system which cannot receive input from the insertion of the badge. [#168 at 25–26].

   ***Administrative Burden.*** The operative question is whether the time at issue in this case "cannot as a practical administrative matter be precisely recorded for payroll purposes." § 785.47. Nelnet relies on *Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*, 821 F.3d 1069, 1082 (9th Cir. 2016), which the court finds instructive. [#168 at 26]. In *Corbin*, the Defendant's timekeeping system rounded an employee's reported time to the nearest quarter-hour and Plaintiff alleged this deprived him of one (1) minute of compensable time over several years of employment. *Id.* at 1073. Applying the same test applicable in the Tenth Circuit, the Ninth Circuit found that the administrative burdens of capturing this additional time were outweighed by the practical administrative burden. *Id.* at 1081–82.

> First, the practical administrative burden on [Defendant] to cross-reference every employee's log-in/out patterns is quite high. To do so, [Defendant] would have to double-check four time stamps (clocking in/out for work; clocking in/out for lunch) for each employee on each day on the off-chance that an employee accidentally loaded an auxiliary program . . . before loading [the relevant timekeeping software]. Indeed, Corbin's argument that [Defendant] should have done such an analysis would require [Defendant] to undermine its policy prohibiting off-the-clock work by proactively searching out and compensating violations. Moreover, Corbin's contention that the de minimis doctrine does not apply because [Defendant] could ascertain the exact log-in/out times by scouring its computer records is baseless; the de minimis doctrine is designed to allow employers to forego just such an arduous task.

*Id.*[6]

In this case, Nelnet argues that it faces a similar burden and states that it "would be administratively infeasible for Nelnet to incorporate the Timestamps for timekeeping and payroll purposes, whether using the Timestamps alone or in conjunction with the existing Timekeeping System and payroll system." [#168 at 26]. Indeed, to get the undisputed times at issue in this case, Nelnet's expert had to do precisely the same laborious cross-checking task the Ninth Circuit rejected in *Corbin*. [*Id.*]. The fundamental problem is that the evidence before the court, even taken in the light most favorable to Plaintiff, is insufficient to permit a factfinder to conclude that the Imprivata badge swipe may be linked to the timekeeping system and can, as a practical administrative matter, be precisely recorded for payroll purposes without either procuring a custom-ordered software to link the two or undergoing the laborious cross-checking at issue in *Corbin*. [*Id.* at 11, 26]; Material Facts ¶¶ 17–19.

Plaintiff's argument that there are multiple methods Defendants could have used to accurately record this data, including adding timeclocks at the desks to replace the current system, designing new software, or cross-referencing the data, is unsupported by admissible

---

[6] The court notes that the *Corbin* court is assuming that time spent booting up Plaintiff's computer and loading work programs before clocking into the timekeeping is compensable.

evidence. [#174 at 18]. Plaintiff does not present any admissible evidence that would permit a factfinder to concluded that these alternatives are not burdensome, nor does Plaintiff rebut Nelnet's proffered material facts with admissible evidence establishing the implausibility of such alternatives. Thus, the court finds this prong weighs heavily in favor of Defendant. Defendant is not obliged to use any specific timekeeping system, and Plaintiff fails to set forth admissible evidence that his proposed solutions, e.g., requiring Nelnet to entirely change the timekeeping system to a punch-clock, to undergo laborious manual cross-checking, or to design a new type of software to link the two unrelated systems, would not be burdensome. *Aguilar v. Mgmt. & Training Corp.*, No. CV 16-00050 WJ/GJF, 2017 WL 4804361, at *18 (D.N.M. Oct. 24, 2017) (finding this factor favored defendant when the time was not able to be reliably recorded unless defendant posted personnel at every location where the uncompensated time occurred); *see also Hubbs v. Big Lots Stores, Inc.*, No. LA-CV-1501601-JAK-ASX, 2018 WL 5264143, at *4 (C.D. Cal. July 11, 2018) ("Courts have also held that employers are not required to reconfigure administrative systems to capture small amounts of compensable time."); *Haight v. The Wackenhut Corp.*, 692 F. Supp. 2d 339, 345 (S.D.N.Y. 2010) ("The Court concludes that the time spent donning/doffing generic protective gear is *de minimis*. The Court finds [seven] minutes to be an insignificant amount of time such that the practical administrative difficulty of recording the additional time would outweigh the size of the claim in the aggregate."); *Alvarado v. Costco Wholesale Corp.*, No. C 06-04015 JSW, 2008 WL 2477393, at *4 (N.D. Cal. June 18, 2008) (finding that repositioning the time clock was burdensome and thus this factor weighed in favor of employer).

**The Aggregate Size of the Claim.** Under the multi-factor test in *Reich*, the court may look to either the total value of the claim, the total number of workers, or the value of the claim

per individual worker. 144 F.3d at 1334. The court finds that under any measure this factor weighs in favor of Nelnet.

The court begins by disregarding the non-joined putative members of the collective. Plaintiff argues in part that the size of the claim is large because there are approximately 3,150 additional employees who did not join this collective. [#174 at 19]. But the test refers to the size of the *claim* and the work performed by the *claimants. Reich*, 144 F.3d at 1334; *Lindow*, 738 F.2d at 1063 ("Moreover, courts in other contexts have applied the de minimis rule in relation to *the total sum or claim involved in the litigation.*" (emphasis added)). The court therefore disregards non-joined members of the collective as irrelevant to this issue. For those currently joined in this litigation, lost wages for both the Boot-Up and Citrix-Active Time totals approximately $30,000. [#168 at 28; #174 at 19].

Although the courts within the Tenth Circuit have not expressly held, the application of this doctrine in the Ninth Circuit—which applies the same test—considers the average claim per employee, aggregating a day's *de minimis* activities. There's no doubt that nearly 30,000 man-hours of work in *Hubbs* was significant in absolute terms, but it averaged out to only "an average gap time that is less than three minutes per shift." *Hubbs*, 2018 WL 5264143, at *9; *see also Chao v. Tyson Foods, Inc.*, 568 F. Supp. 2d 1300, 1319 (N.D. Ala. 2008) ("Regardless of the number of employees for whom Plaintiff seeks back wages, or the length of time for which such pay is sought, the proper focus is on the aggregate amount of uncompensated time for each employee per day, not the total number of employees over any length of time. . . . This court's decision is consistent with [*Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir. 1998)].")). *But see Lindow*, 738 F.3d at 1063 ("We would promote capricious and unfair results, for example, by

compensating one worker $50 for one week's work while denying the same relief to another worker who has earned $1 a week for 50 weeks.").

By contrast, other courts have emphasized the need to look at the entire amount at issue in the litigation. *See Rutti v. Lojack Corp.*, 596 F.3d 1046, 1057 (9th Cir. 2010) ("[C]ourts apply 'the de minimis rule in relation to the total sum or claim involved in the litigation.'" (quoting *Lindow*, 738 F.2d at 1063)); *Reich*, 144 F.3d at 1334. Under any view, the court disregards the claims of those not joined. *Perez v. Wells Fargo & Co.*, No. C 14-0989 PJH, 2015 WL 1887354, at *7 (N.D. Cal. Apr. 24, 2015) ("*Lindow* does not hold that the court should consider the aggregate size of the entire [collective's] claim in the absence of other, relevant, factual allegations." (quotation marks omitted)).

In absolute terms, the Parties agree that the lost wages total approximately $30,000, well below what other courts have found to be *de minimis* amounts. *Aguilar*, 2017 WL 4804361, at *18 (finding this factor favored defendant when the claim was worth an indeterminate amount less than $355,478.00). Plaintiff claims that this court should include various measures of enhanced damages in this calculation, bringing the figure nearer to $60,000. [#174 at 19]. Notably, this section of the Response is devoid of any authority, and the court sees no basis to aggregate an uncertain, unawarded measures of damages. The *de minimis* test is concerned with the balance between the burden in remedying the situation in relation to the amount of lost wages, statutory damages are not relevant to this analysis. As it stands, the court finds that in absolute terms the aggregate amount of the claim strongly supports a *de minimis* finding.

When considered on a per-capita basis, Plaintiff fares no better. There are 336 opt-in plaintiffs and plus the one named Plaintiff leaves the court with 337 total. For $30,000 of damages, that comes out to $84 per plaintiff over the collective period, from July 15, 2014 to

April 25, 2018, based on regular periods of between one and two minutes of uncompensated work.  The court does not have sufficient information before it to determine precisely the average lost wages per work day as undoubtedly not every plaintiff worked full time during the entirety of the collective period, but there is no evidence in the record to suggest that the figure amounts to more than cents, rather than dollars, per day.  *Singh v. City of New York*, 524 F.3d 361, 371 (2d Cir. 2008) ("[W]e conclude that any additional commuting time in this case is de minimis as a matter of law . . . . [T]he plaintiffs' depositions show that the aggregate claims are quite small, generally amounting to only a few minutes on occasional days."); *Haight*, 692 F.Supp.2d at 345. Unlike *Singh*, the time here occurred on a regular basis, but also unlike *Singh*, often did not even amount to one minute.  The court concludes that this factor strongly weighs in favor of Defendant given the trivial total sum and the brief daily time at issue.  *Hesseltine v. Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509, 520 (E.D. Tex. 2005) (finding a time of ten to fifteen minutes per day to be *de minimis*).

After weighing the relevant factors, this court concludes that the Boot-Up Time and the Citrix-Active Time, collectively "pre-shift activities," constitute *de minimis* time and are therefore not compensable.  The court reaches this conclusion, *inter alia*, due to the unrebutted evidence that adjusting to account for this time would require a substantively different timekeeping system, representing a serious administrative burden on the Defendant.  Plaintiff has simply failed to adduce sufficient evidence to persuade the court, or even create a genuine issue of material fact, that Defendant was seriously and systematically undercompensating its employees.  Even with hundreds of Opt-Ins, the amount allegedly underpaid over the course of the collective action period is at best $30,000 and likely less. Given the serious administrative burden and the "few seconds or minutes of work beyond the scheduled working hours" at issue,

the court concludes that this time is *de minimis*. Accordingly, summary judgment shall enter in favor of Defendant.[7]

## III. The Court Declines to Exercise Supplemental Jurisdiction.

Defendant briefly states that this court should decline to exercise supplemental jurisdiction over the sole remaining state law claim in this case asserted by Mr. Peterson in his individual capacity. [#168 at 30]. Mr. Peterson opposes this request. [#174 at 20].

A court may dismiss a case when, as here, the court dismisses all claims over which it had original jurisdiction. 28 U.S.C. § 1367(c)(3). In determining whether to exercise supplemental jurisdiction over state law claims, a court enjoys substantial discretion to balance the exercise of jurisdiction with the needs of the case and judicial economy. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–74 (1997). The Supreme Court and Tenth Circuit have both held that "If federal claims are dismissed before trial, leaving only issues of state law, 'the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.'" *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)). While not an ironclad rule inflexibly applied, the Tenth Circuit has stated that courts "usually should" decline to exercise jurisdiction in such circumstances. *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

The sole remaining claim in this case is Mr. Peterson's individual state law claim under the Colorado Wage Claim Act. [#29 at ¶¶ 67–77]. In considering the exercise of jurisdiction,

---

[7] Having determined that the pre-shift activities in this case are compensable but *de minimis* and therefore Defendant is entitled to summary judgment, the court does not pass on the merits of the Defendant's Motion to Decertify [the] FLSA Collective Action [#171] which is accordingly denied as moot.

the court considers the parties' interests in the efficient resolution of the matter in the forum with which they are familiar and before a judicial officer familiar with the case, with the principles of federalism and comity inherent in committing issues of state law to state courts. *Cohill*, 484 U.S. at 350. Consistent with the principle that "[n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary," the court declines to exercise jurisdiction. *Thatcher Enterprises v. Cache Cty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990); *Knight v. Century Park Assocs., LLC*, No. 14-CV-1584-WJM-NYW, 2015 WL 4575085, at *4 (D. Colo. July 30, 2015) (declining supplemental jurisdiction after dismissal of federal claims); *Sauer v. McGraw-Hill Companies, Inc.*, No. 99 N 1898, 2001 WL 1250099, at *18 (D. Colo. June 12, 2001) (declining to exercise supplemental jurisdiction over Plaintiff's Colorado Wage Claim Act claims following resolution of the federal claims). The court will remand the matter to state court, avoiding any statute of limitations issues that may arise from dismissal without prejudice.

**CONCLUSION**

For the forgoing reasons, **IT IS ORDERED** that:

(1)    Plaintiff Andrew Peterson's Motion for Summary Judgment [#158] is **DENIED**;

(2)    Defendant Nelnet's Motion for Summary Judgment [#168] is **GRANTED;**

(3)    Defendant Nelnet's Decertification Motion [#171] is **DENIED AS MOOT**;

(4)    The court **DECLINES** to exercise supplemental jurisdiction under § 1367(c)(3);

(5)    This case is **REMANDED** to Denver District Court;

(6)    The Clerk of the Court is directed to **TRANSMIT** this case to the appropriate state authority.


DATED:  August 23, 2019

Nina Y. Wang
United States Magistrate Judge